IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENNIS WARNER, | : | 1:20-cv-1758 |
| Plaintiff, | : | |
| v. | : | Hon. John E. Jones III |
| UNITED NATURAL FOODS, INC., | : | : |
| Defendant. | : | |

**MEMORANDUM**

**January 13, 2021**

Presently pending before the Court is Defendant United Natural Foods, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint (the "Motion"). (Doc. 6). The Motion has been fully briefed, (Docs. 7, 8, 13), and is ripe for disposition. For the following reasons, the Motion shall be granted.

I.   **BACKGROUND**

In accordance with the standard of review applicable to a motion to dismiss, the following facts are derived from Plaintiff's complaint and viewed in the light most favorable to him.

Defendant United Natural Foods, Inc. ("UNFI"), a Rhode Island corporation, maintains a wholesale food distribution operation in York, PA. (Doc. 4 at ¶¶ 2,

1

19).  On December 16, 2019, UNFI hired Plaintiff Dennis Warner as a loader at that York location.  (*Id.* at ¶ 7).

In the months immediately thereafter, the COVID-19 pandemic hit the Commonwealth of Pennsylvania.  On March 6, 2020, Governor Wolf declared a state of emergency pursuant to 35 Pa. C.S. § 7301(c).  (*Id.* at ¶ 10).  On March 19, Governor Wolf issued an executive order prohibiting all non-life sustaining businesses from operating.  (*Id.* at ¶ 11).  For those essential businesses permitted to remain open, compliance with certain mitigation efforts, such as social distancing protocols, was mandated.  (*Id.*).  Because Defendant UNFI is a wholesale food distributer, it qualified as an "essential" business and was permitted to remain in operation subject to those mitigation standards.  (*Id.* at ¶ 19).

The March 19 order also directed the Secretary of Health to identify further disease mitigation efforts.  (*Id.* at ¶ 12).  On April 15, 2020, the Secretary of Health ordered essential businesses to implement certain social distancing, mitigation, and cleaning protocols to help contain the spread of the COVID-19.  (*Id.* at ¶ 13).  The Secretary of Health also instructed that employees of essential businesses who develop COVID-19 symptoms "should notify their superior and stay home."  (*Id.* at ¶ 15).  Soon after, the Department of Health created an online COVID-19 complaint form for business patrons and employees to report any relevant issues or concerns (such as lack of social distancing, employees coming to work sick, or

employers not providing employees with enough personal protective equipment) directly to state public health officials. (*Id.* at ¶¶ 17–18). In the weeks preceding the March 19 and April 15 orders from, respectively, the Governor and the Secretary of Health, Plaintiff "noticed that Defendant was not implementing social distancing and COVID-19 mitigation measures," as required. (*Id.* at ¶ 21).

In early May, Plaintiff began experiencing COVID-19 symptoms. (*Id.* at ¶ 22). He visited his doctor, who advised him to self-quarantine pending the result of a COVID-19 test. (*Id.* at ¶ 23). Plaintiff then notified two supervisors at work of his situation; Plaintiff was "directed" by those supervisors to self-quarantine and not report to work until he received the test result. (*Id.* at ¶¶ 24–25).

In the meantime, Plaintiff proceeded to report Defendant to the Department of Health, using the department's online COVID-19 complaint form, for what he perceived to be violations of the Secretary of Health's April 15 order. (*Id.* at ¶ 26). These alleged violations included "not adequately sanitizing the York County facility, [] not enforcing social distancing amongst its employees, and [] not notifying its employees when they came in contact with a coworker who had contracted COVID-19." (*Id.*). In his complaint, Plaintiff identified himself as an employee of UNFI. (*Id.*). Plaintiff avers, upon information and belief, that a state official then contacted Defendant regarding his complaint. (*Id.* at ¶ 28).

On or around May 20, 2020, UNFI's Director of Human Resources, Lori Leedy, reached out to Plaintiff Warner. (*Id.* at ¶ 29). Ms. Leedy asked, allegedly "[i]n a hostile manner," why Plaintiff believed UNFI had not been adequately sanitizing the facility. (*Id.*). Ms. Leedy also explained to Plaintiff that UNFI could not notifiy employees about other employees who contracted COVID-19 due to certain confidentiality concerns. (*Id.*).

The next day, Plaintiff received a negative result from his COVID-19 test. (*Id.* at ¶ 30). On his next scheduled workday, May 27, Plaintiff returned to the York facility. (*Id.* at ¶ 31). While attempting to hand Ms. Leedy paperwork that confirmed his negative test result, Ms. Leedy told Plaintiff that he should not bother because he was soon going to be terminated. (*Id.*). When Plaintiff asked for clarification, he was allegedly ignored and escorted off the premises. (*Id.* at ¶ 32).

Plaintiff thereafter filed suit in the Pennsylvania Court of Common Pleas of York County on August 26, 2020. (Doc. 1, Ex. A). Defendant subsequently removed that action to this Court on September 25. (Doc. 1). After Defendant moved to dismiss, (Doc. 2), Plaintiff on October 6, 2020, filed an Amended Complaint, which is now the operative pleading. (Doc. 4). The Amended Complaint sets forth a single cause of action against UNFI: wrongful termination in violation of public policy. (*Id.* at ¶¶ 35–46). Plaintiff sets forth two theories in

support of his wrongful termination claim: first, that he was wrongfully terminated in retaliation for his complaint to the Department of Health; alternatively, that he was wrongfully terminated because he missed work pending the result of his COVID-19 test in accordance with the March 19 and April 15 executive orders recommending that employees stay home if symptomatic. (*Id.* at ¶¶ 33–34).

Defendant filed the instant motion on October 20, 2020, (Doc. 6), and a brief in support on the same day, (Doc. 7). Plaintiff filed his brief in opposition on October 30, (Doc. 8), and Defendant filed its reply brief on November 13, (Doc. 13). Accordingly, the Motion is ripe for our review. For the following reasons, we shall grant the Motion and dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.

## II.   STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint, . . . and

any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirement of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint attacked by Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level…." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Accordingly, to satisfy the plausibility standard, the complaint must indicate that defendant's liability is more than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679. Next, the district court must identify "the 'nub' of the … complaint – the well-pleaded, nonconclusory factual allegation[s]." *Id.* Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief. *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips,* 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556-57). Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

### III. DISCUSSION

Employment in Pennsylvania is typically at-will. *See McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000) ("[T]he presumption of all non-contractual employment relations is that it is *at-will* and that this presumption is an extremely strong one.") (emphasis in original); *White v.*

7

*FedEx Corp.*, No. 1:19-CV-00325, 2019 WL 5102168, at *4 (M.D. Pa. Oct. 11, 2019) ("In the context of an employment-at-will relationship, Pennsylvania courts have long recognized that an employer may terminate an employee for any reason absent a contractual or statutory provision to the contrary.") (citing *McLaughlin*, 750 A.2d at 286).  There is one exception to this general rule: when a termination violates a "clear mandate of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009).  This exception applies "only in the most limited circumstances," and "the power of the courts to declare pronouncements of public policy is sharply restricted." *Id.* (citing *Mamlin v. Genoe (City of Philadelphia Police Beneficiary Ass'n)*, 17 A.2d 407, 409 (Pa. 1941)).  The Supreme Court of Pennsylvania has instructed that a court should utilize the public policy exception "[o]nly in the clearest of cases." *Id.*

What constitutes "public policy" in the Commonwealth is determined by reference to judicial decisions of Pennsylvania courts, the Pennsylvania constitution, and statutes promulgated by the Pennsylvania legislature. *McLaughlin*, 750 A.2d at 288.  An employee's subjective belief that his termination violated public policy is not sufficient: "[A]bsent a violation of law, it is difficult for an at-will employee seeking recovery for wrongful discharge to point to a common law, legislative, or constitutional principle from which a clear public policy [mandate] could be inferred." *Clark v. Modern Grp., Ltd.*, 9 F.3d

8

321, 328 (3d Cir. 1993). Accordingly, "Pennsylvania courts have recognized the public policy exception where the employer: (1) compels the employee to engage in criminal activity; (2) prevents the employee from complying with a duty imposed by statute; or (3) discharges the employee when a statute expressly prohibits such termination." *Zorek v. CVS Caremark Corp.*, No. 1:13-CV-1949, 2014 WL 12487695, at *3 (M.D. Pa. Apr. 16, 2014) (citing *Tanay v. Encore Healthcare, LLC*, 810 F.Supp.2d 734, 738 (E.D. Pa. 2011)).

Here, Plaintiff's wrongful termination claim is premised on two theories. Plaintiff first asserts that Defendant UNFI violated Pennsylvania public policy by terminating him in retaliation for his complaint to the Department of Health concerning Defendant's allegedly lackluster COVID-19 mitigation efforts. (Doc. 4 at ¶ 33). Alternatively, Plaintiff avers that he was terminated for missing work pending the results of his COVID-19 test in accordance with the Governor's and Secretary of Health's instructions. (*Id.* at ¶ 34).

Defendant UNFI argues that Plaintiff's wrongful termination claim is fatally flawed for two reasons. First, Plaintiff's claim must be dismissed because he identifies nothing in the Pennsylvania Constitution, no statute promulgated by the legislature, no administrative regulation, or any judicial decision "that articulates a public policy UNFI violated or otherwise thwarted by terminating his employment." (Doc. 7 at 13). To the extent that Plaintiff depends on the

9

Governor's March 19, 2020 order or the Secretary of Health's April 15 order regarding COVID-19 mitigation efforts, Defendant argues that those executive orders are not sources from which clear pronouncements of public policy can derive. (*Id.*). Second, Defendant argues that even if either executive order could constitute sources of public policy for purposes of a wrongful termination claim, Plaintiff's claim still fails because he does not allege UNFI asked him to commit a crime, prevented him from complying from a statutorily imposed duty, or terminated his employment in contravention of any statutory prohibition. (*Id.* at 14).

To Defendant's first point, Plaintiff counters by arguing that his termination did violate public policy as pronounced by the legislature. Plaintiff points to the Emergency Management Services Code (the "Emergency Code"), promulgated by the legislature at 35 Pa. C.S. § 7101 *et seq*. According to Plaintiff, the legislature provided a mechanism for the governor to wield certain emergency powers during disasters, and because the COVID-19 mitigation orders—including the instruction to potentially symptomatic employee to stay home from work—were issued pursuant to those emergency powers, Defendant's conduct implicated a matter of public policy. (Doc. 8 at 13–15).

Regarding Defendant's second argument, Plaintiff claims that an employee need not have an "affirmative duty" to report misconduct to a state agency for a

retaliatory termination to violate public policy. In support of this argument, Plaintiff points to two cases: *Highhouse v. Avery Transp.*, 660 A.2d 1374, 1378 (Pa. Super. Ct. 1995), where the Pennsylvania Superior Court held that terminating an employee in retaliation of that employee's application for unemployment benefits violated public policy, and *Shick v. Shirey*, 716 A.2d 1231 (Pa. 1998), where the Supreme Court of Pennsylvania similarly ruled that an employer cannot retaliate against an employee who applies for workers' compensation benefits. (*Id.* at 19). Plaintiff argues that since applying for those benefits are voluntary actions, and the plaintiffs there had no affirmative duty to do so, likewise here it is no consequence that Plaintiff Warner was not statutorily obligated to report Defendant to the Department of Health. (*Id.*).

Plaintiff also argues that, under his second theory, he was essentially terminated for refusing to commit a crime because violating the Governor's and Secretary of Health's quarantine instruction could theoretically risk a fine and jail time. (*Id.* at 17). He analogizes his termination to an employee wrongfully fired for refusing to serve a drunk patron in violation of the state liquor code. (*Id.*) (citing *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 702 (3d Cir. 1988)).

We agree with Defendant on both points. Neither of Plaintiff's theories of liability can succeed as a matter of law.

11

First, we are skeptical that Plaintiff has alleged an articulable and recognizable public policy that can premise a wrongful termination claim under either theory. This is not to say that we condone Defendant's alleged conduct. Indeed, we are considerably troubled by Plaintiff's allegations. But the Supreme Court of Pennsylvania has instructed courts to ascertain whether an employer's conduct implicates public policy by reference to the state constitution, Pennsylvania judicial precedent, and statutes promulgated by the Pennsylvania legislature. *See McLaughlin*, 750 A.2d at 288; *Weaver*, 975 A.2d at 563. We see no clear pronouncement of public policy regarding an employer's responsibilities during the COVID-19 crisis in any of those sources that can sustain Plaintiff's theories.[1]

Further, we have not identified any case to support the proposition that an executive order alone can articulate the Commonwealth's public policy. And this makes sense—an executive order, especially one enacted under the Emergency

---

[1] Plaintiff claims that a Pennsylvania court "has already recognized that the public policy exception applies under nearly identical circumstances." (Doc. 8 at 17). We disagree with that assertion. Plaintiff points to *Gaya v. Person Directed Supports, Inc.*, No. 2020-C-1241 (Pa. C.P. Lackawanna Cnty.), where a trial court in September 2020 denied an employer's preliminary objection to an employee's wrongful termination claim that arose, like here, in the context of COVID-19 mitigation orders. But the trial court order was completely silent as to why the preliminary objection was overruled. (Doc. 8-2 at 2). There is nothing about this bare trial court order that amounts to a clear pronouncement of Pennsylvania public policy, and we are not convinced it holds any persuasive value here.

Code to respond to a crisis, is usually temporary, and does not undergo the same rigorous enactment process as a statute or administrative regulation.

We are sympathetic to Plaintiff's argument that Defendant's conduct potentially undermined the Commonwealth's ability to mitigate the spread of COVID-19.  It is also true that the Governor's and Secretary of Health's powers to mandate certain pandemic mitigation standards do derive from statute, namely the Emergency Code.  But as a federal court sitting in diversity jurisdiction, we must heed the instructions of the Pennsylvania Supreme Court: the public policy exception should only apply in "the *most limited* of circumstances where the termination implicates a *clear* mandate of public policy in this Commonwealth." *McLaughlin*, 750 A.2d at 287 (emphasis added).  We are hesitant to pronounce that an employment decision potentially inconsistent with an executive branch's COVID-19 mitigation efforts clearly violates public policy where there is no affirmative indication that the legislature would agree.  *See Weaver*, 975 A.2d at 563 ("The right of a court to declare what is or is not in accord with public policy exists 'only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it.'") (quoting *Mamlin*, 17 A.2d at 409).  The Pennsylvania Supreme Court has recognized that even though a court *may* determine public policy in the absence of any legislative pronouncement, it must only be in certain narrow circumstances:

> There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal. . . . If, in the domain of economic and social controversies, a court were, under the guise of the application of the doctrine of public policy, in effect to enact provisions which it might consider expedient and desirable, such action would be nothing short of judicial legislation, and each such court would be creating positive laws according to the particular views and idiosyncrasies of its members. Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.

*Mamlin*, 17 A.2d at 409. Plaintiff has not convincingly shown us any "well-defined, universal public sentiment" that Defendant violated. *Id.* Again, to reiterate, we do not excuse Defendant's alleged conduct. But public policy of the Commonwealth of Pennsylvania cannot be based on the whims of an individual judge or the allegations of an aggrieved employee. *See White*, 2019 WL 5102168, at *4 ("Absent an articulated public policy mandate, there can be no claim for wrongful discharge under Pennsylvania law."). Because Plaintiff has not identified any clear pronouncement of public policy that Defendant allegedly violated, Plaintiff cannot state a claim for wrongful termination in violation of public policy.

But even if we found that clearly-established public policy *was* implicated—that is, if we were inclined to let this case proceed given the obvious public health concerns inherent in dismissing an employee who reports (presumably in good faith) violations of the executive branch's COVID-19 mitigation efforts—we would still be compelled to dismiss this case based on Defendant's second

argument. As we have stated, application of the public policy exception has been largely limited to circumstances where an employer: "(1) compels the employee to engage in criminal activity; (2) prevents the employee from complying with a duty imposed by statute; or (3) discharges the employee when a statute expressly prohibits such termination." *Zorek*, 2014 WL 12487695, at *3; *see also Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2003)). Plaintiff has failed to plausibly allege that any of these three circumstances are present here, under either of his two theories of liability.

For the first theory—that he was wrongfully terminated based on his complaint to the Department of Health—Plaintiff was not under any affirmative or statutory duty to report alleged violations of the executive branch's COVID-19 mitigation orders. Plaintiff's argument that one need not be under any affirmative duty to make a report does not withstand scrutiny. Pennsylvania state and federal courts have consistently dismissed wrongful termination claims premised on retaliation theories where the plaintiff had no duty to make the report he or she was allegedly fired for submitting. *See Donahue v. Fed. Exp. Corp.*, 753 A.2d 238, 244 (Pa. Super. Ct. 2000) (observing that Pennsylvania courts have "repeatedly rejected claims that a private employer violated public policy by firing an employee for whistleblowing, when the employee was under no legal duty to report the acts at issue"); *Spierling v. First Am. Home Health Servs., Inc.*, 737 A.2d 1250, 1254 (Pa.

Super. Ct. 1999) (rejecting a nurse's wrongful termination claim because she had no legal duty to report past Medicare fraud); *Hennessy v. Santiago*, 708 A.2d 1269, 1273–74 (Pa. Super. Ct. 1998) (rejecting a mental-healthcare worker's wrongful termination claim because the plaintiff was not required to affirmatively report the suspected rape of a patient and so her subsequent termination was not illegal); *see also Smith v. Calgon Carbon Corp.*, 917 F.2d 1338, 1345–47 (3d Cir. 1990) (holding that the public policy exception to at-will employment doctrine was inapplicable where no "positive law" required the employee to report employer's environmental violations); *Kent v. Keystone Human Servs.*, 68 F. Supp. 3d 565, 570 (M.D. Pa. 2014) ("In the present case, Plaintiff cites no specific statutory or administrative provision that placed upon her (or a person in her position) the affirmative duty to report Defendant's alleged violations. Accordingly, the Court finds that she does not fit within the public policy exception to Pennsylvania's general at-will employment policies, and will dismiss Count IV of her amended complaint."); *Zorek*, 2014 WL 12487695, at *5 ("Because we find that Plaintiff had no affirmative legal duty to report dispensing errors, we must dismiss his wrongful discharge claim."). Even though the Department of Health created an online complaint form for employees to submit reports of suspected violations of the Commonwealth's COVID-19 mitigation orders, this still did not impose any statutory, legal, or affirmative duty to actually report potential violations.

In support of his argument that a plaintiff need not have any affirmative duty to state a wrongful termination claim premised on retaliation, Plaintiff references judicial decisions that found violations of public policy where employees were terminated after applying for workers' compensation or unemployment benefits. (Doc. 8 at 19). But those cases are clearly inapposite. In *Highhouse*, the Superior Court said that an employer violates public policy when it terminates an employee for applying for unemployment benefits. *Highhouse*, 660 A.2d at 1378. The court acknowledged that Pennsylvania courts "have consistently held that employers violate the public policy of this Commonwealth by discharging employees for exercising legal rights," and the right of an employee to receive unemployment benefits is one of those legal rights granted by the Commonwealth. *Id.* at 1377. In *Shick*, the Pennsylvania Supreme Court found that permitting an employer to terminate an employee for filing a workers' compensation claim would frustrate the entire statutory design: the workers' compensation statute was intended to be the exclusive means of obtaining compensation for injuries, and this exclusivity was "the historical quid pro quo that employers received in return for being subjected to a statutory, no-fault system of compensation for worker injuries." *Shick*, 716 A.2d at 1137 (quoting *Poyser v. Newman & Co., Inc.*, 522 A.2d 548, 550 (Pa. 1987)). The court held that this "historical balance would be disrupted if the employer could terminate an employee for filing a workers' compensation

17

claim." *Id.* In both cases, terminating employees for applying for benefits that the legislature determined they had the legal right to obtain violated public policy because the actions of the employers would undermine entire legislative schemes. Upholding the legality of the terminations would have also frustrated clearly-established legal rights that were statutorily granted to employees. Neither can be said here, and neither of these two cases are relevant.

Rather, this case is much more akin to the cases cited *supra* involving plaintiffs fired for reporting their employers' misconduct to government authorities: where a plaintiff has no statutory or otherwise affirmative duty to report his or her employer, the narrow public policy exception to Pennsylvania's at-will employment doctrine cannot apply. *Cf. Hunger v. Grand Cent. Sanitation*, 670 A.2d 173, 176 (Pa. Super. Ct. 1996) ("We have recognized a public policy exception only in extremely limited circumstances. If an employee is fired for performing a function that he is *required* to perform by law, an action for wrongful discharge on public policy grounds will be allowed.") (emphasis in original). Plaintiff was under no statutory duty to report Defendant's conduct to the Department of Health, and, therefore, this theory of retaliation cannot sustain his wrongful termination claim.

Plaintiff's second, alternative theory also fails. To reiterate, Plaintiff claims he was fired because he stayed home from work while he awaited the results of his

COVID-19 test. He avers that because the Secretary of Health's April 15 order instructed that symptomatic employees "should notify their supervisor and stay home," (Doc. 4, Ex. B, at 20), and because violations of the Pennsylvania Disease Prevention and Control Law could potentially yield a fine or jail sentence, Defendant essentially terminated him for refusing to commit a crime. There are several problems with this theory, however. First, it is far from certain that Plaintiff would have suffered criminal penalties if he worked instead of self-quarantining pending his COVID-19 test result. The April 15 order Plaintiff references merely *encouraged* employees to stay home if they were symptomatic, as indicated by the word "should." (*Id.*). The order does not threaten any enforcement against individual employees. Second, while one who violates the Disease Prevention and Control Law faces certain criminal penalties, one who ignored the Secretary of Health's recommendation likely would not be in violation of "any provisions of [the Disease Prevention and Control] act or any regulations." 35 Pa. Stat. § 521.20(a). The generalized instruction to stay home from work is not enshrined in any provision of the Disease Prevention and Control Law or in any Department of Health regulation, and Plaintiff was not individually ordered to self-isolate or quarantine pursuant to the Department of Health's codified authority.[2]

---

[2] Plaintiff also mischaracterizes 35 P.S. § 521.20(a). He claims that those who violate an "emergency health order" face potential prosecution under that statute, but that is not true. The law very plainly says that "[a]ny person who violates any of the *provisions of this act* or *any*

*See* 28 Pa. Code. § 27.60.  Third, and perhaps most fatally, Plaintiff's theory is simply implausible.  Plaintiff avers in his Amended Complaint that he notified his supervisors that he had COVID-19 symptoms and that he had taken a COVID-19 test; following this conversation, those supervisors "directed" him "to self-quarantine pending the results of [the] COVID-19 test."  (Doc. 4 at ¶ 24).  In the next paragraph, Plaintiff again clearly states that he stayed home from work "[a]s directed by . . . Defendant[.]".  (*Id.* at ¶ 25).  In other words, Plaintiff pleads that he quarantined while waiting for test results *at the direction of his supervisors*.  It is implausible that Defendant instructed him to stay home from work while he waited for his test results, and then fired him because he stayed home from work while waiting for his test results.  We cannot sustain a claim pled in this manner.  Because neither of Plaintiff's theories of liability are plausibly alleged, we will grant the Motion and dismiss this case.

## IV.   CONCLUSION

For the foregoing reasons, we shall grant Defendant's Motion to Dismiss.  A separate order shall issue in accordance with this ruling.

---

*regulation* shall" face be subject to a fine or a maximum 30-day jail sentence.  35 P.S. § 521.20(a) (emphasis added).  As we have discussed, the relevant section of the April 15 order from the Secretary of Health was not an "order," but merely a recommendation.

20